# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBBIN APPLESTEIN-CHAKIRIS,<br><br>                Plaintiff,<br>v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,<br><br>                Defendant. | CASE NO. 09cv00009 BTM(WMc)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiff Robbin Applestein-Chakiris claims she became disabled on January 1, 1991, after her second suicide attempt, due to chronic depression, memory loss, and degenerative disc disease. (Tr. 175-76.) On December 22, 2004, Plaintiff filed an application for Supplemental Security Income, and her application was denied initially and upon reconsideration. (Tr. 114.) Administrative Law Judge Larry B. Parker ("ALJ") held a hearing on July 26, 2006, and, in a decision filed on August 17, 2006, found Plaintiff not disabled and therefore ineligible for Supplemental Security Income. (Tr. 47-80, 172-80.) On April 19, 2007, the Appeals Council remanded the case back to the ALJ to (1) consider new and material evidence from Plaintiff's treating psychiatrist, Dr. Prather; (2) obtain additional evidence concerning Plaintiff's bipolar disorder, degenerative disc disease, and drug

dependency; and (3) conduct further proceedings required to determine whether drug addiction and alcoholism are contributing factors material to the finding of disability. (Tr. 192-93.) The ALJ held another hearing on October 1, 2007, and, in a decision filed on December 13, 2007, again found Plaintiff not disabled and ineligible for Supplemental Security Income. (Tr. 36-37.) The ALJ's decision became final on November 18, 2008, when the Appeals Council declined review. (Tr. 6-8.)

Plaintiff presently seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g). For the reasons discussed below, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant's cross-motion for summary judgment. The case is remanded to the Commissioner for calculation of benefits.

## II. FACTUAL BACKGROUND

Plaintiff is a 52 year old woman with a GED, obtained in 1994, after dropping out of school in the seventh grade. (Tr. 50, 289.) Plaintiff alleges that she has been disabled since January 1, 1991, after her second suicide attempt, due to chronic depression, memory loss, and degenerative disc disease of her lumbar spine. However, Plaintiff did not file a Title XVI application for supplemental security income until December 22, 2004. (Tr. 50, 175-76.) Plaintiff also has a history of intravenous drug abuse, hepatitis C, chronic obstructive pulmonary disease, and bipolar disorder. (Tr. 176, 280.) Plaintiff worked as a greeter and cashier at Wal-Mart from 1998 to 2001, as a telemarketer in 2001, and as a home health attendant in 2002. (Tr. 246.) Plaintiff was unable to maintain employment at these jobs because of her failure to perform duties, poor attendance, and difficulties in working with people. (Tr. 280, 291-92.)

The record indicates that Plaintiff grew up in a chaotic environment with alcoholic parents. (Tr. 616.) Plaintiff was molested by one of her mother's boyfriends when she was young. (Id.) Plaintiff became depressed at a young age and began abusing heroin at the age of 12 or 13, around the time she dropped out of school. (Id.) Plaintiff has been repeatedly incarcerated since the 1970's, usually for drug offenses. (Tr. 474.) Cheryl Ann

Horton, who has known Plaintiff since she was 20 years old, states that Plaintiff has always been unstable. (Tr. 269-76.)

### A. Plaintiff's Physical Impairments

The record contains medical documentation of Plaintiff's back pain as early as 1997. (Tr. 327-28.) Plaintiff's back pain and degenerative disc disease were noted on numerous occasions during her incarceration in 2003 and 2004. (Tr. 398, 381, 379-80, 357, 350-52, 353-54.) Plaintiff's depression was also noted. (Tr. 378.)

On March 21, 2005, Dr. Thomas Sabourin examined Plaintiff for complaints of pain in her upper and lower back, wrist, and hips. (Tr. 421.) Dr. Sabourin diagnosed chronic lumbar strain and sprain syndrome, noting that Plaintiff "most likely does have some limitations." (Tr. 424.) Dr. Sabourin opined that Plaintiff could only lift or carry fifty pounds occasionally and twenty-five pounds frequently, could stand and walk six hours of an eight-hour workday, and could sit for six hours of an eight-hour workday. (Id.) Dr. Sabourin also noted that Plaintiff was currently using Robaxin, Motrin, and Vicodin to treat her back pain. (Id.)

Beginning on March 7, 2007, Dr. Douglas Politoske of San Diego Digestive Disease Consultants treated Plaintiff for her liver problems. (Tr. 587.) Dr. Politoske diagnosed Plaintiff with cirrhosis of the liver and noted her bipolar disorder. (Tr. 591-93.) On April 9, 2007, Dr. Politoske again noted Plaintiff's underlying cirrhosis with evidence of portal hypertension, and recommended a liver biopsy. (Tr. 594.) On June 6, 2007, Dr. Politoske diagnosed cirrhosis of the liver and again noted Plaintiff's bipolar disorder. (Tr. 595.)

On August 16, 2007, Dr. Thomas Sabourin again examined Plaintiff at the request of the Department of Social Services. (Tr. 603.) Plaintiff's chief complaint was pain in the lower back and left shoulder. (Id.) Dr. Sabourin diagnosed degenerative disc disease at L4-L5 moderate and L5-S1 severe and mild adhesive capsulitis of the left shoulder. (Tr. 607.) Dr. Sabourin opined that Plaintiff could only lift or carry twenty pounds occasionally and ten pounds frequently; could stand and walk up to six hours of an eight-hour workday and sit for

six hours of an eight-hour work day; and could climb, stoop, kneel, and crouch only occasionally. Dr. Sabourin also opined that Plaintiff had manipulative limitations and would be able to work with her left arm above shoulder level only occasionally. (Id.)

**B.     Plaintiff's Mental Impairments**

On March 24, 2005, consulting physician Dr. Mounir Soliman examined Plaintiff for complaints of depression and nightmares. (Tr. 428.) Dr. Soliman recorded Plaintiff's mood as depressed with congruent affect. Dr. Soliman noted that Plaintiff's neurovegetative signs and symptoms were significant for decreased concentration and decreased energy. (Tr. 430.) Dr. Soliman diagnosed depression not otherwise specified, hepatitis B and C, back pain, and lack of social support. (Tr. 430-31.) Dr. Soliman opined that Plaintiff was able to understand, carry out, and remember simple and complex instructions; Plaintiff was able to interact with co-workers, supervisors, and the general public; and Plaintiff was able to withstand the stress and pressures associated with an eight-hour workday and day-to-day activities. (Tr. 431.)

Beginning in September 2005, Dr. J. Moussai of UCSD treated Plaintiff for complaints of depression, "feeling lousy", and insomnia. (Tr. 465-67.) On September 9, Dr. Moussai noted Plaintiff's obesity, cooperation, irritability, hoarse speech, depressed mood with constricted affect, auditory hallucinations, and generalized anxiety symptoms. (Tr. 465.) Dr. Moussai diagnosed depression with psychotic features, anxiety not otherwise specified, and prescribed Celexa[1]. (Id.) On October 21, 2005, Dr. Moussai recorded Plaintiff's progress as poor and noted her anxiety, agitation and apparent crying. (Tr. 463.) On November 17, 2005, Dr. Moussai treated Plaintiff for complaints of tactile hallucinations, skin picking, and mild anhedonia. (Tr. 462.) Dr. Moussai described Plaintiff as depressed with constricted affect, slow in speech, and paranoid. (Id.) Dr. Moussai again prescribed Celexa. (Id.) On January 25, 2006, Dr. Moussai treated Plaintiff for complaints of depression, anxiety, and

---

[1]Celexa is principally used to treat depression. See Physician's Desk Reference 1160-61 (63rd ed. 2009).

insomnia, noting that Plaintiff exhibited poor compliance in taking medications. (Tr. 461.) Dr. Moussai made note of Plaintiff's slow speech, psychomotor retardation, and depressed mood with constricted affect. (Id.) Dr. Moussai augmented Plaintiff's Celexa treatment with a prescription of Risperdal[2]. (Id.)

In February 2006, Plaintiff attempted suicide by walking into oncoming traffic and was subsequently treated at Sharp Mesa Vista Hospital by Dr. Emad Tadros. (Tr. 473-74.) Dr. Tadros treated Plaintiff for complaints of being tired of living, hearing voices, and anxiety. (Id.) Dr. Tadros described Plaintiff as "[h]opeless, pessimistic, and helpless," with a severely dysphoric mood and affect markedly restricted to depression. (Tr. 475.) Dr. Tadros diagnosed manic depressive disorder, severe depression, polysubstance abuse, and substance induced mood disorder. (Tr. 476.)

On February 28, 2006, Plaintiff was transferred from Sharp Mesa Vista Hospital to UCSD, where Dr. Calabrese noted agitation and an anxious mood during Plaintiff's mental status examination. (Tr. 660.)

Beginning in April 2006, psychiatrist Dr. Richard Prather of UCSD treated Plaintiff for her mental problems. (Tr. 658.) On April 3, 2006 Plaintiff complained of running out of Celexa but indicated that the medication did not help. (Id.) Dr. Prather noted Plaintiff's casual disheveled dress, raspy speech, depressed mood, and constricted affect. (Id.) Dr. Prather prescribed Seroquel[3] and Risperdal. (Id.) On May 2, 2006, Dr. Prather treated Plaintiff for complaints of sleep problems and stress. (Tr. 657.) Dr. Prather noted a partial response to treatment. (Id.) Dr. Prather also noted Plaintiff's casual dress and grooming, slow speech, depressed mood, and sullen affect. (Id.) Dr. Prather prescribed a higher

---

[2] Risperdal is principally used as an antipsychotic, often in treatment of schizophrenia. See The MERCK Manual 1729 (18th ed. 2006).

[3] Seroquel is principally used to treat dysphoric hypomania in patients with bipolar II disorder. See U.S. National Institutes of Health, "Seroquel in the Treatment of Dysphoric Hypomania in Bipolar II" (2007), available at http://clinicaltrials.gov/ct2/show/NCT00186043.

dosage of Seroquel and also prescribed Wellbutrin[4]. (Id.) On June 19, 2006, Dr. Prather treated Plaintiff for complaints of continued depression. (Tr. 656.) Dr. Prather noted a partial response to treatment in addition to Plaintiff's casual dress and grooming, depressed mood, anxiety, and constricted affect. (Id.) On July 10, 2006, Dr. Prather treated Plaintiff for complaints of hypomania and depression. (Tr. 655). Dr. Prather noted a fairly good response to treatment, and observed Plaintiff's casual dress and grooming, less depressed mood, and wider range of affect in his mental status examination. (Id.) Dr. Prather again prescribed Seroquel. (Id.) On September 5, 2006, Dr. Prather treated Plaintiff for complaints of continued depression. (Tr. 654.) Dr. Prather took note of Plaintiff's casual dress and grooming, less slow speech, depressed mood, and overall down affect. (Id.) Dr. Prather continued Plaintiff on her medications and increased the dosage of Wellbutrin. (Id.)

On October 9, 2006, Dr. Prather wrote a letter to Plaintiff indicating his diagnosis of severe bipolar affective disorder with severe symptoms, energy and fatigue problems, and motivation and endurance problems. (Tr. 586.) In the letter, Dr. Prather observed that Plaintiff had difficulty concentrating, retaining information, and following through with tasks. (Id.) Dr. Prather opined that Plaintiff's condition rendered her with a permanent disability and that it was not possible for Plaintiff to hold a job. (Id.)

On November 13, 2006, Dr. Prather treated Plaintiff for complaints of sleep problems, depression, and hearing voices telling her that she was worthless. (Tr. 652.) Dr. Prather noted Plaintiff's casual grooming, blunted affect, flat speech, depressed mood, good insight, and fair judgment. (Id.) Dr. Prather prescribed Lamictal[5]. (Id.) On February 6, 2007, Dr. Prather noted a partial response to treatment and observed Plaintiff's casual dress and grooming, low depressed mood, appropriate affect, and low anhedonia. (Tr. 651.) Dr. Prather continued Plaintiff's medications and restarted the Lamictal starter pack. (Id.) On March 19, 2007, Dr. Prather noted a partial response to treatment and observed Plaintiff's

---

[4] Wellbutrin is principally used to treat major depressive disorder. See Physician's Desk Reference 1648-49 (63rd ed. 2009).

[5] Lamictal is principally used to treat bipolar disorder. See Id. at 1488-91.

casual dress and grooming, moderate depression, and less constricted affect. (Tr. 650.) Dr. Prather continued Plaintiff's medication and again prescribed Lamictal. (Id.)

On July 2, 2007, Dr. Prather treated Plaintiff for complaints of a manic episode occurring one month prior, a major depressive episode occurring two weeks prior, and anhedonia. (Tr. 649.) Dr. Prather noted that Plaintiff ran out of medication and subsequently experienced decreases in sleep, appetite and energy. (Id.) Dr. Prather made note of Plaintiff's appropriate affect, coarse voice, depressed mood, linear thought process, mildly decreased cognitive ability, and very poor memory. (Id.) Dr. Prather restarted Plaintiff on Lamictal, Seroquel, and Wellbutrin. (Id.)

On August 1, 2007, Dr. Sheldon Kramer, a consulting physician, examined Plaintiff. (Tr. 625.) Dr. Kramer observed Plaintiff's obesity, withdrawn presentation, fair eye contact, tearfulness, normal speech, depression, anxiety, irritability, mood swings to extreme agitation, appropriate affect, poor concentration, and fair to poor judgment. (Tr. 626.) Dr. Kramer administered the Weschler Adult Intelligence Scale - III to measure Plaintiff's IQ and noted results of a verbal IQ of 63, performance IQ of 58, and a full scale activity IQ of 58. (Id.) Dr. Kramer also administered the Weschler Memory Test - III and noted that Plaintiff scored in the "extremely low range." (Tr. 627.) Dr. Kramer diagnosed bipolar disorder with mood congruent delusions, rule out ADHD, and rule out learning disability. (Id.) Dr. Kramer opined that "the combination of extreme mood instability and depression in combination with severe cognitive deficits would make this person a difficult candidate to work a full eight hour day and be able to do even simple repetitive tasks" and that Plaintiff "would clearly need help with her finances." (Id.)

On August 4, 2007, Dr. Manolito Castillo, a consulting physician, examined Plaintiff for complaints of bipolar disorder, degenerative disk disease, and cirrhosis. (Tr. 616.) Dr. Castillo's report stated that Plaintiff had been incarcerated more than twenty times since 1975, when Plaintiff was eighteen years old. (Tr. 618.) Dr. Castillo noted Plaintiff's intact memory, depressed mood, and euthymic affect. (Tr. 618-619.) Dr. Castillo listed Plaintiff's daily activities as consisting of watching television, visiting her son, caring for her personal

hygiene, and doing chores like washing dishes, vacuuming, and shopping. (Tr. 619). Dr. Castillo also listed Plaintiff's hobbies as playing with her son and stated that Plaintiff is able to use public transportation, can drive, and handles her own funds. (Id.) Dr. Castillo diagnosed bipolar disorder, not otherwise specified, post traumatic stress disorder, polysubtance dependence in full-sustained remission, and psychosocial and environmental problems related to her health and mental illness. (Id.) Dr. Castillo opined that Plaintiff had moderate limitations in her ability to complete detailed tasks, her ability to complete complex tasks, and her ability to concentrate for at least two hour increments at a time in order to maintain a regular work schedule. (Tr. 620.)

On August 17, 2007, Dr. Prather treated Plaintiff for two recent experiences of hypomania. (Tr. 648.) Dr. Prather noted a partial response to treatment and observed Plaintiff's casual dress and grooming, affective lability, and anhedonia. (Id.) On September 25, 2007, Dr. Prather wrote a letter on a prescription pad stating that Plaintiff was adherent to her treatment plan and was "totally disabled rendering her unable to work in any capacity." (Tr. 104.)

Dr. Prather treated Plaintiff on three documented occasions afer the October 1, 2007, hearing before the ALJ. On November 26, 2007, Dr. Prather treated Plaintiff for complaints of depression and anxiety. (Tr. 647.) Dr. Prather noted a limited response to treatment and observed Plaintiff's casual grooming, improved mood, and generally appropriate affect. (Id.) Dr. Prather prescribed increased dosages of Lamictal and Seroquel. (Id.) On February 4, 2008, Dr. Prather treated Plaintiff for complaints of stress, feeling down, insomnia, disorganized thinking, flight of ideas, heart racing and shaking. (Tr. 646.) Dr. Prather noted that Plaintiff failed to follow the increased dosage of Lamictal and observed Plaintiff's distraught appearance, poor eye contact, down mood, dysphoric affect, fair insight and fair judgment. (Id.) Dr. Prather prescribed an increased dosage of Lamictal and continued Plaintiff on the increased dosage of Seroquel. (Id.) On May 29, 2008, Dr. Prather treated Plaintiff for complaints of anxiety attacks, depression, and stressors related to her homelessness. (Tr. 645.) Dr. Prather's mental status examination noted Plaintiff's casual,

dirty and disheveled dress, psychomotor slowing, slow speech, anxious mood, depressed affect, tearfulness, and mild paranoia. (Id.) Dr. Prather continued Plaintiff's medications. (Id.)

### III. THE ALJ'S DECISION

The Social Security Regulations mandate a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Social Security Act ("Act"). The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether claimant's impairment is severe. If not, claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in Appendix 1 to Subpart P of Part 404. If so, claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether claimant has the residual functional capacity ("RFC") to be able to do any past relevant work. If so, claimant is not disabled. If not, the evaluation continues to step five. (5) Whether claimant is able to do any other work. If not, claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs available in the national economy that claimant can perform, then claimant is not disabled. 20 C.F.R. § 404.1520. See also Batson v. Comm'r of the Social Security Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).

The ALJ determined that (1) Plaintiff had not engaged in substantial gainful activity since December 22, 2004, the application date; (2) Plaintiff has the following severe impairments: depression not otherwise specified, degenerative disc disease, and learning disorder; (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff is unable to perform any past relevant work; and (5) there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically packing line worker and laundry folder. (Tr. 27-28, 35-36.)

Specifically, the ALJ concluded that Plaintiff had the RFC "to perform light level

activities with moderate restriction of activities of daily living, marked difficulties in social functioning, mild difficulties in maintaining concentration, persistence or pace for simple repetitive tasks with no public contact, and minimal contact with peers and supervisors." (Tr. 30.)

In reaching this conclusion, the ALJ found that Dr. Prather's disability opinion was not entitled to controlling weight and Plaintiff's allegations of disabling symptoms were not credible. (Tr. 34-35.) The ALJ discredited Dr. Prather's opinion on the grounds that it "[is] not supported by objective evidence in his records and [is] inconsistent with the other substantial evidence of record." (Tr. 34.) The ALJ discredited Plaintiff's allegations of disabling pain and symptoms because: "First, there is no evidence the claimant underwent regular treatment . . . Second, the objective medical evidence of record does not support impairments likely to produce disabling pain or limitation. Third, the claimant has not alleged an inability to provide for her own personal care. Fourth, Dr. Castillo . . . reported the claimant's activities of daily living consisted of watching television and visiting with her son. The claimant was able to take care of her personal hygiene. She was able to do chores, i.e., washing dishes, vacuuming, and shopping. Her hobbies include playing with her son. The claimant was able to use public transportation, drive a car, and handle her own funds." (Tr. 35.)

## IV. DISCUSSION

Plaintiff contends that (1) the ALJ's finding that her mental impairments do not meet or equal the criteria of Listing 12.05C is not supported by substantial evidence; (2) the ALJ's step five RFC finding improperly rejected or ignored treating and consultative source evidence and otherwise lacks the support of substantial evidence; and (3) the ALJ's reasons for discrediting Plaintiff's subjective complaints are both factually and legally insufficient[6].

---

[6] Plaintiff also contends that (1) the ALJ failed to satisfy his heightened duty to Plaintiff, who was unrepresented during the October 1, 2007, hearing; and (2) the ALJ erred in failing to find Plaintiff's obesity a legally severe impairment at step two. These arguments are secondary to those discussed herein and are not necessary to reach since the Court remands for calculation of benefits on the basis of the arguments discussed.

The Court finds the ALJ's finding that Plaintiff did not meet or equal Listing 12.05C was erroneously based on the requirement of a formal diagnosis of mental retardation. The Court need not reach a conclusion as to whether Plaintiff meets the diagnostic criteria of Listing 12.05C because the Court also finds that the ALJ's rejection of Dr. Prather's opinion was improper because it was not based on specific and legitimate reasons supported by substantial evidence in the record.  In addition, the Court finds that the ALJ improperly discredited Plaintiff's subjective complaints, which further corroborate Dr. Prather's medical opinion.  Crediting Dr. Prather's opinion and Plaintiff's symptom and pain testimony, it is evident that Plaintiff is disabled and entitled to an award of benefits.

**A.      Standard of Review**

The Commissioner's denial of disability benefits will be disturbed on appeal only where the ALJ's findings are based on legal error or are unsupported by substantial evidence. Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).  Substantial evidence means more than a scintilla, but less than a preponderance of relevant evidence, and is evidence such that reasonable minds, considering the entirety of the record, might accept as support for the conclusion. Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).  The Court must weigh the evidence that supports and detracts from the ALJ's conclusion and, where the evidence tends to support either outcome, the Court cannot substitute its own opinion for that of the ALJ. Matney v. Sullivan, 981 F.2d 1016, 1018 (9th Cir. 1992); Martin v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).

**B.      Listing 12.05C**

To meet Listing 12.05C, a claimant must fulfill both the diagnostic description and the severity criteria.  See Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) ("This court agrees with the Commissioner that the requirements in the introductory paragraph are mandatory."); Randall v. Astrue, ___ F.3d ___, 2009 WL 1578236 at *5 (5th Cir. 2009) (holding that "every mental disorder listing includes two independent components: a

diagnostic description of the disorder and specific criteria measuring the disorder's severity."); Lax v. Astrue, 489 F.3d 1080, 1085 (10th Cir. 2007) (noting that the capsule definition and severity prong are two separate requirements under Listing 12.05). The diagnostic description of mental retardation requires a showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." The severity criteria for Listing 12.05C requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404, Subpt. P, App. 1.

The ALJ erroneously held that Plaintiff's mental impairments did not meet or medically equal the requirements of Listing 12.05 because no formal diagnosis of mental retardation had been made. (Tr. 29-30.) Although the Ninth Circuit has yet to rule on this issue, the Eighth Circuit has repeatedly held that Listing 12.05 does not require a formal diagnosis of mental retardation. See Maresh, 438 F.3d at 899 ("However, this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retardation. The plain language of the Listing does not so state, and the Commissioner cites no supporting authority."); Christner v. Astrue, 498 F.3d 790, 794 (8th Cir. 2007) ("the ALJ erroneously credited a lack of medical diagnoses of mental retardation."); Lewis v. Astrue, 2008 WL 191415 at *5 (N.D.Cal. Jan. 22, 2008) ("recent authority holds that a diagnosis of mental retardation is not required to meet Listing 12.05" (citing Christner)). This Court agrees with the Eighth Circuit that no formal diagnosis of mental retardation is required to meet the criteria of Listing 12.05.

The ALJ also erroneously held that "the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less," citing Dr. Bolter's skepticism about Plaintiff's scores because Dr. Kramer did not issue a formal diagnosis of mental retardation. (Tr. 30.) While an ALJ may question the validity of an IQ score, he may not reject them out of hand without substantial evidence supporting his decision to do so. See Lax v. Astrue, 489 F.3d

1080, 1088 (10th Cir. 2007) (holding that the ALJ properly rejected claimant's IQ scores by enumerating six specific reasons, five of which were supported by substantial evidence, for his decision to do so).  Here, neither the ALJ nor Dr. Bolter noted any evidence that would impugn the validity of the IQ scores, save for Dr. Bolter's observation that Dr. Kramer made no formal diagnosis.  Plaintiff's verbal IQ score of 63, performance IQ score of 58, and full scale activity IQ score of 58 clearly fall within the range specified by Listing 12.05C, which is bounded by a ceiling score of 70.

To satisfy the other prong of the severity requirement, which requires "a physical or other mental impairment imposing an additional and significant work-related limitation of function," the Ninth Circuit has adopted the standard that "an impairment imposes a significant work related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Fanning v. Bowen, 827 F.2d 631, 633 (9th Cir. 1987).  The limitations that Plaintiff's degenerative disc disease (Tr. 327-28, 357, 350, 352-54, 333-34,421-25, 544-47, 603-608) and bipolar disorder (Tr. 269-77, 462, 469, 499, 586, 628, 104, 634-42) impose on her ability to work are well documented and clearly more than slight or minimal.

The only remaining question is whether Plaintiff meets the diagnostic criteria of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Though some courts have credited low IQ scores after age twenty-two as presumptively satisfying the diagnostic criteria, the Ninth Circuit has not yet adopted this presumption. See Hartman v. Astrue, 2008 WL 4089255 at *15 (W.D.Wash. Aug. 29, 2008) (noting that it is an open question "whether or not the presumption of a fairly constant IQ score applies in this circuit.").  In addition to low IQ scores, Plaintiff dropped out of school in the seventh grade, a circumstance which other courts have held to evidence manifestation of mental impairments before age twenty two. See Maresh, 438 F.3d at 900; Christner, 498 F.3d at 793.  The record also indicates that Plaintiff suffered depression at a young age, was molested by her mother's boyfriend, has a history of suicide attempts, and has been in and out of jail since her late teens.  Though

the preceding facts indicate that Plaintiff may satisfy the diagnostic criteria, the Court cannot make findings on an incomplete record. Absent other grounds for relief, the Court would remand for development of the record and findings regarding this issue. However, a remand is not necessary because Plaintiff prevails on other grounds.

### C.     Rejection of Dr. Prather's Opinion

As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Where a treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1990). In doing so, the ALJ must do more than proffer his own conclusions – he must set forth his own interpretations and why they are superior to that of the treating physician's. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988). The ALJ may meet this burden by conducting a detailed and thorough discussion of the facts and conflicting evidence, and by explaining his interpretations and findings. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

Even if the treating physician's opinion is inconsistent with other substantial evidence in the record, the treating physician's opinions are still entitled to deference and must be weighted using the factors provided in 20 C.F.R. § 404.1527. Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); SSR 96-2p. These factors include, inter alia, the "nature and extent of the treatment relationship" between the patient and the treating physician, the "length of the treatment relationship and the frequency of examination," the amount of relevant evidence that supports the opinion and the quality of the explanation provided, and the consistency of the medical opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ found "no reason to give controlling weight to the opinions of Dr. Prather as

a treating source, as they are not supported by objective evidence in his records and are inconsistent with the other substantial evidence of record." (Tr. 34.) This finding is problematic in three respects, each of which will be discussed in turn.

First, the ALJ's finding is impermissibly vague. The ALJ failed to explain what facts or conflicting clinical evidence caused him to reach his conclusion. The ALJ failed to explain or even identify which other doctor's opinions were inconsistent with Dr. Prather's opinion. The ALJ agreed with the conclusion of Dr. Bolter, the testifying expert, that Dr. Prather's opinion of disability was conclusory and not backed up by mental status examinations or Dr. Prather's own progress notes. However, Dr. Bolter's opinion was itself conclusory and inaccurately characterized Dr. Prather's opinion, which was in fact backed up by thoroughly documented diagnoses of Plaintiff's mental impairments throughout Dr. Prather's extensive treatment relationship with Plaintiff. Furthermore, the ALJ failed to consider the factors set forth in 20 C.F.R. § 404.1527 and failed to address how much weight he accorded Dr. Prather's opinion.

Second, Dr. Prather's opinion is largely consistent with other evidence of record and, to the extent that it is not, can be explained by the episodic nature of Plaintiff's mental impairments. Plaintiff's other treating physicians of record consistently noted her bipolar disorder and social difficulties and, for the most part, those that opined on her ability to work expressed concern and concluded that Plaintiff would have some limitations. Consulting physician Dr. Kramer, after a single examination, opined that Plaintiff was a difficult candidate to work a full eight-hour day or to perform even simple repetitive tasks. (Tr. 625-628.) Days after Dr. Kramer's examination, Dr. Castillo examined Plaintiff and opined that Plaintiff had moderate limitations in her ability to complete detailed tasks but no other limitations. (Tr. 616-21.) Only Dr. Soliman, after a single examination, opined that Plaintiff was capable of work without qualification. (Tr. 428-31.) None of these physicians or any other physician in the record had a treatment relationship with Plaintiff comparable to that of Dr. Prather.

The factors enumerated in 20 C.F.R. § 404.1527 militate in favor of heavily weighting Dr. Prather's opinion. One factor looks to the length of the treatment relationship and the

frequency of examination, emphasizing the ability to provide a longitudinal picture of the impairment. 20 C.F.R. § 404.1527(d)(2)(i). Dr. Prather treated Plaintiff no less than fifteen times over the course of two years. Another factor looks to the extent of the treatment relationship and the treating source's knowledge of the impairments. 20 C.F.R. § 404.1527(d)(2)(ii). Dr. Prather is a board certified psychiatrist and treated only Plaintiff's mental impairments, for which he repeatedly prescribed medication.

Dr. Prather's treatment relationship with Plaintiff also gave him the most complete picture of Plaintiff's episodic impairments. Bipolar disorder is, by its nature, episodic. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 382, 392 (Text Revision 4th ed. 2000). Some of Plaintiff's treating physicians, like Dr. Tadros, saw Plaintiff immediately after a major episode, while other examining doctors, like Dr. Soliman, saw Plaintiff between episodes. Only Dr. Prather treated Plaintiff long enough to see how her bipolar disorder and other mental impairments impacted her everyday life. Dr. Prather's own progress notes reflect Plaintiff's ups and downs over the course of years. "Occasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability." Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995). "That a person who suffers from . . . anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." Holohan, 246 F.3d at 1205. Here, Plaintiff's history of episodes of depression and mania, interspersed with occasional symptom-free periods, is not inconsistent with disabling bipolar disorder.

Third, the ALJ erroneously emphasizes the lack of objective medical evidence of Plaintiff's mental impairments in Dr. Prather's records. Objective laboratory results are not the exclusive means for supporting a conclusion of disability; a finding of disability may also be predicated on medically-acceptable clinical diagnoses. Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985). Clinical observations and diagnoses of treating psychiatrists are essential to a mental disability inquiry because psychiatric impairment is "not as readily amenable to substantiation by objective laboratory testing." Christensen v. Bowen, 633

F.Supp. 1214, 1220-21 (N.D. Cal. 1986) (quoting Lebus v. Harris, 526 F.Supp. 56, 60 (N.D. Cal. 1981)); see also SSR 85-16.  Although medically determinable mental impairments cannot be established by symptoms alone, an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques – including assessment by psychiatrists or psychologists – represents a medical "sign" rather than "symptom."  SSR 96-4p n.2; 20 C.F.R. § 404, Subpt. P, App. 1, 12.00(B).  Accordingly, it is improper to require that mental disabilities be established by precise scientific methods or laboratory results.  Christensen, 633 F.Supp. at 1220-21; 42 U.S.C. § 423(d)(3).  Dr. Prather's opinion was based on his mental assessments of Plaintiff and his resulting diagnoses.

When the ALJ incorrectly rejects a treating physician's opinion, the Court credits that opinion as a matter of law.  Lester, 81 F.3d at 834.  Dr. Prather opined that Plaintiff is unable to work due to her mental impairments.  Crediting Dr. Prather's opinion as a matter of law, it is clear that Plaintiff's mental impairments, coupled with her physical impairments established by the record, render her disabled and entitled to an award of benefits.  See Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) ("In the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate.").

**D.    Claimant's Subjective Pain and Symptom Testimony**

In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis.  See Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996).  The first stage of analysis is a threshold test set forth in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986).  Under this test, the claimant must (1) produce objective medical evidence of an impairment or impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of the symptoms

described. Id. at 1407-08. "Once the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). If the claimant satisfies the Cotton test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. Smolen, 80 F.3d at 1281. The ALJ must state specifically which symptom testimony is not credible and what facts in the record support that conclusion. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

The ALJ rejected Plaintiff's subjective symptom and pain testimony for four enumerated reasons:

> First, there is no evidence the claimant underwent regular treatment employing a regimen of therapy consistent with the alleged severity of her complaints for any period of twelve or more continuous months, which could reasonably be expected from one suffering unrelenting pain, debilitating symptoms, and severe functional limitations such as those alleged by the claimant. Second, the objective medical evidence of record does not support impairments likely to produce disabling pain or limitation. Third, the claimant has not alleged an inability to provide for her own personal care. Fourth, Dr. Castillo in consultative examination of August 4, 2007 reported the claimant's activities of daily living consisted of watching television and visiting with her son. The claimant was able to take care of her personal hygiene. She was able to do chores, i.e., washing dishes, vacuuming, and shopping. Her hobbies include playing with her son. The claimant was able to use public transportation, drive a car, and handle her own funds.

(Tr. 35.)

Each of these reasons are problematic. First, Plaintiff has been in and out of jail for her entire adult life and experienced unstable living environments during the period of record, moving from a sober living home to living with her daughter to homelessness. Expecting adherence to a regular treatment regimen in light of these circumstances is unreasonable. The Ninth Circuit has noted that the failure to maintain a regular treatment regimen does not necessarily belie subjective symptom and pain complaints because "[t]here may be claimants with good reasons for not seeking treatment." Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989). Plaintiff's failure to maintain a regular treatment regimen and compliance with her medications is explained at least partly by the very mental impairments her treatments were

intended to address. The record notes instances of Plaintiff ceasing medication and treatment due to the overwhelming commands of her auditory hallucinations and because she thought people were trying to poison her. (Tr. 474, 482.)

Second, much of Plaintiff's inability to work is attributable to her mental impairments. For the reasons discussed in Section IV.C, supra, objective laboratory results are not the only evidence of mental impairments. It is improper to require that mental disabilities be established by precise scientific methods or laboratory results. Christensen, 633 F.Supp. At 1220-21; 42 U.S.C. § 423(d)(3).

Third, neither the ALJ nor Defendant cites any authority for the proposition that an inability to provide for one's personal care is necessary to a finding of disability. A claimant can still be found disabled even when she can carry out some activities of personal care. See Reddick v. Chater, 157 F.3d 715, 722 (9 th Cir. 1998); Benecke, 379 F.3d at 594.

Fourth, the Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." Benecke, 379 F.3d at 594 (quoting Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)). In order for a claimant's daily activities to be used to discredit her subjective pain and symptom testimony, the cited activities must occupy a substantial part of the claimant's day and utilize skills transferable to the workplace. Vertigan, 260 F.3d at 1049. The ALJ has made no finding as to how much time Plaintiff's daily activities occupy, or as to the transferability of activities like watching television, visiting with her son, and occasional household chores. The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise does not in any way detract from her credibility as to her overall disability." Id. at 1050. In fact, Plaintiff's longtime acquaintance Cheryl Ann Horton testified that Plaintiff can perform household chores only infrequently due to physical pain, only goes shopping infrequently due to the anxiety Plaintiff experiences in public, and can only walk a couple of blocks before needing rest. (Tr. 271-72, 274.) The ALJ offered no reasons for

ignoring this lay testimony.

Ninth Circuit cases have explained that "a claimant need not 'vegetate in a dark room' or 'be a total basket case' to be found unable to engage in substantial gainful activity." Magallanes, 881 F.2d at 756. "Several courts, including [the Ninth Circuit], have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Reddick, 157 F.3d at 722. Accordingly, it was improper for the ALJ to rely on Plaintiff's minimal daily activities to discredit her subjective symptom and pain testimony.

Thus, since the ALJ failed both (1) to identify any of the specific testimony Plaintiff gave about her functional limitations that he found not credible, and (2) to provide "clear and convincing" reasons for discounting her testimony, the Court concludes that the ALJ's reasons were insufficient to reject Plaintiff's testimony.

## V. CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is **GRANTED**. Defendant's cross-motion for summary judgment is **DENIED**. The decision of the ALJ is reversed, and the case is remanded to the Social Security Administration for a calculation of benefits. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: August 5, 2009

Honorable Barry Ted Moskowitz
United States District Judge